# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

ANTONIO ALUIA, NOEL AYALA, MICHAEL
AMOROSO, RONALD BAKER, MICHAEL
CHRISTOPOULOS, GERARD CONTALDI, ERIC
DICESARE, RINO DISTEFANO, DENNIS DONEHEY,
RICHARD ECKERT, MICHAEL HARVEY, KYLE
HEATH, HEATH JOHNSTON, NICHOLAS KERGER,
PETER KERGER, MARK LITTLEFIELD, JOSEPH
PALLADINO, JOHN PELLEGRINI, DAVID PELRINE,
LORENZO PUCCIO, EDWARD RILEY, BRENDAN
SELUTA, STEPHEN TENAGLIA, MARC TODISCO,
JAMES WILLIAMS, and LEROL ZEPHYR
Plaintiffs,

v.

CITY OF MEDFORD, MAYOR BREANNA LUNGO-
KOEHN, IN HER INDIVIDUAL AND OFFICIAL
CAPACITY, AND LISA CROWLEY, DIRECTOR OF
HUMAN RESOURCES, IN HER INDIVIDUAL AND
OFFICIAL CAPACITY, AS DEFENDANTS
Defendants.

## COMPLAINT AND JURY DEMAND

### INTRODUCTION

1.     On December 9, 2024, Plaintiffs, employees of the Medford Department of Public

Works (DPW), were abruptly pulled off their jobs, ordered to the DPW garage, and, under threat

of termination, subjected to invasive and unsanitary drug and alcohol testing. The testing,

conducted in a van with its door left open, exposed Plaintiffs to public view while a technician

failed to follow basic hygiene protocols, such as changing gloves between handling breathalyzer

tubes, urine samples, and other materials. No employee tested positive, and there was never any

good faith reason to believe they would. The tests violated Medford's Alcohol and Controlled

Substance Testing Policy, Department of Transportation regulations (49 C.F.R. § 382.307), and

the Fourth Amendment's protections against unreasonable searches. Far from a legitimate workplace safety measure, the tests were a retaliatory volley in an ongoing feud with Plaintiffs and their union. Defendants Mayor Breanna Lungo-Koehn and HR Director Lisa Crowley ordered the testing in bad faith to punish Plaintiffs for their protected activities, including opposing the Mayor's administration, participating in court cases against the City, engaging in public protests and rallies, and for the suggestion that the Mayor engages in political favoritism. This retaliatory testing violated Plaintiffs' constitutional rights under the Fourth and First Amendments and their statutory rights under Massachusetts General Laws, Chapter 149, § 148A. Plaintiffs now seek redress for these unlawful and retaliatory actions.

## PARTIES

2.      Plaintiffs Antonio Aluia, Noel Ayala, Michael Amoroso, Ronald Baker, Michael Christopoulos, Gerard Contaldi, Eric Dicesare, Rino Distefano, Dennis Donehey, Richard Eckert, Michael Harvey, Kyle Heath, Heath Johnston, Nicholas Kerger, Peter Kerger, Mark Littlefield, Joseph Palladino, John Pellegrini, David Pelrine, Lorenzo Puccio, Edward Riley, Brendan Seluta, Stephen Tenaglia, Marc Todisco, James Williams, Lerol Zephyr are employees of the City of Medford, in its Department of Public Works ("DPW"). They are unionized and represented for collective bargaining purposes by Teamsters Local 25.

3.      Defendant City of Medford ("Medford," "the City," or "Defendant Medford") is a municipality organized under the laws of the Commonwealth of Massachusetts, located in Middlesex County, Commonwealth of Massachusetts. The Defendant Medford is the civil entity responsible for the administration of all public agencies in the City of Medford, including its Department of Public Works.

4.      Defendant Breanna Lungo-Koehn ("Defendant Lungo-Koehn" or "Mayor Lungo-Koehn") is an adult resident of the Commonwealth of Massachusetts. She is the duly

elected Mayor of Medford, and as such, acted under the color of state law at all times relevant to this action. During the period pertinent to this Complaint, Mayor Lungo-Koehn was acting within the scope of her authority as the Mayor of Medford. As Mayor, Lungo-Koehn served as the final decisionmaker for the policies, practices, and customs of Medford, including those governing the Department of Public Works, employee discipline, and workplace drug testing. She was responsible for ensuring that all agencies and officials under her authority complied with constitutional protections, including the prohibition against unreasonable searches and seizures and the safeguarding of First Amendment rights. As set forth below, Defendant Lungo-Koehn personally participated in and directed actions which she knew or reasonably should have known violated Plaintiffs' rights under the United States Constitution and Massachusetts law. Her decisions and directives represent the official policy of the City of Medford. She is being sued in both her individual and official capacities.

5.      Defendant Lisa Crowley ("Defendant Crowley" or "Director Crowley") is the Director of Human Resources for the City of Medford and an adult resident of the Commonwealth of Massachusetts. At all times relevant to this action, she acted under the color of state law and within the scope of her authority as Director of Human Resources. As HR Director, Crowley was responsible for overseeing and implementing employment policies, ensuring compliance with applicable laws, and protecting the constitutional rights of Medford employees. This included obligations to adhere to the prohibition against unreasonable searches and seizures and to safeguard employees' First Amendment rights. As set forth below, Defendant Crowley personally participated in and directed actions which she knew or reasonably should have known violated Plaintiffs' rights under the United States Constitution and Massachusetts law. Her decisions and directives represent the official policy of the City of Medford. She is being sued in both her individual and official capacities.

3

## JURISDICTION AND VENUE

6.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

7.     Venue is proper under 28 U.S.C. § 1391 as Defendants Medford and Mayor
Lungo-Koehn reside in this judicial district, and the events occurred within it.

## FACTS

8.     Plaintiffs are employees of Medford's DPW and represented for collective
bargaining by Teamsters Local 25, as are numerous other employees employed by the City of
Medford and Medford School Department, including clerical employees, school custodians,
school security guards, and building inspectors.

9.     According to a Medford Police incident report, on Monday, December 9, 2024, at
approximately 8:30 a.m., a DPW employee discovered an unused syringe in the trash of the
men's locker room at the DPW garage. The employee reported the discovery to his supervisor,
Mike Wentzel, who placed the unused syringe—described as "a white and clear syringe with an
orange cap"—into a clear zip-lock bag. At approximately 12:45 p.m., Captain James M. Benoit
of the Medford Police met Wentzel in his office, took possession of the bag, and secured the
syringe in evidence locker #4. The syringe and bag were entered into the SAFE evidence tracker
system at the Medford Police Department.

10.     Upon discovering the unused syringe, upon information and belief, Wentzel
immediately informed Assistant DPW Superintendent Scott Brinch, who, in turn, promptly
reported the incident to Human Resources Director Lisa Crowley, who subsequently notified the
Mayor.

11.     At approximately 10:00 a.m., following these reports, Director Crowley met with
Brian Hatch and Nancy Campbell, the Teamsters business agents assigned to Medford, about a
dispute involving a union member in the Department of Veteran's Services.

12.     Mayor Breanna Lungo-Koehn and Director Crowley harbor deep animosity toward Local 25 officials, union members, and unionized Medford employees as a whole. This hostility stems from the concerted actions of Medford employees and Local 25 representatives in collective bargaining negotiations, grievance proceedings, election-related disputes, and wage-related litigation against the City. Notable among the wage-related cases include actions brought by DPW employees, who are Plaintiffs in this case (*Ayala et al. v. City of Medford*, 22-10115-MPK), as well lawsuits filed by other Local 25 employees: *Howard et al. v. City of Medford*, 21-cv-10497-IT (school custodians); *Connors et al. v. City of Medford*, 21-cv-11748-MPK (security employees); *Conboy v. City of Medford*, 22-cv-11973-MPK (health inspector); *Gale v. City of Medford*, 22-cv-11932-MPK (election worker); and *Fargo et al. v. City of Medford*, 22-cv-11765-MPK (building inspectors).

13.     Significantly, Local 25 members, including the Plaintiff DPW employees in this action, and their representatives from the Teamsters, have been vocal public opponents of the Mayor and her regime.

14.     Their activities in this regard have included staging a major picket at the Mayor's campaign kickoff event at Ford Tavern, where hundreds of union members displayed signs reading, 'Mayor Brianna Lungo-Koehn Union Busting is Disgusting' and 'Mayor Lungo-Koehn Unfair to City Employees'; protesting outside City Hall during the Mayor's inauguration in January 2024; and organizing rallies at City Hall chambers during open City Council meetings, where union members have publicly criticized the Mayor's policies

15.     Mayor Lungo-Koehn's animosity toward Local 25 has led her to engage in retaliatory and irrational actions. For instance, she ordered the Medford Police to arrest a Local 25 official, Steven South, for trespassing while he was conducting Local 25 business at Medford City Hall. She has terminated the employment Local 25 employees in retaliation for their opposition to Medford's unlawful personnel practices. She has also hired private investigators to

follow employees who have opposed her, hoping that they will commit some act of misconduct which will justify her disciplining them.

16. Mayor Lungo-Koehn also harbors particular animosity against the Plaintiff DPW employees in this action, for bringing claims in this Court against Medford under the FLSA and the Wage Act in *Ayala et al v. City of Medford*, 22-10115-MPK, including for asserting that their rights to make claims under the Wage Act survived a mediated settlement of their FLSA claims.

17. Given this history, the meeting between Local 25's Hatch, Campbell, and Director Crowley, a Massachusetts-licensed attorney like Mayor Lungo-Koehn, was predictably heated. It began with a grievance involving a Veterans Department supervisor, who said she would never ask her employee to break the law. Hatch replied, "I believe you, but you represent the City of Medford, and I do not trust them." To support his claim, he pointed to an ongoing dispute over Medford's practice of forcing DPW employees to operate a crane without the legally required 3A license, threatening termination if they refused.

18. The discussion grew increasingly tense as it shifted to broader safety issues at the DPW, including what Crowley interpreted to be indirect allusions to an employee, who will be referred to here as John Doe, widely believed to have been excepted from scrutiny, despite alleged on and off duty transgressions, believed to be related to substance abuse issues, due to his family's political alliance with the Mayor.

19. In response, Crowley dismissed Hatch's safety concerns by rolling her eyes and remarking, "I received a complaint this morning about a needle." She expressed no concern about this and made no mention that DPW employees would be forced to undergo drug testing because it was found.

20. Nevertheless, immediately after the meeting concluded, Assistant Director Brinch contacted DPW department foreman, directing them to halt all ongoing work and have their

crews report without delay to the DPW muster room for what he described as a "Safety Stand-Down Meeting."

21.     Upon arrival at the DPW garage, Plaintiffs were met by uniformed officers from the Medford Police, including Police Chief Jack Buckley, Captain Barry Clemente, and Captain James Benoit.

22.     Assistant Director Brinch informed Plaintiffs that they were required to submit to drug and alcohol testing and were not permitted to leave until the tests were completed. He did not announce to the Plaintiffs why they were being tested.

23.     The City of Medford Alcohol and Controlled Substance Testing Policy states that refusing to submit to a required drug or alcohol test "will constitute a voluntary resignation and the employee's services will be immediately terminated."

24.     Testing was conducted in an RPT Labs van parked outside. Before providing samples, Plaintiffs were required to sign a "Consent for Urine Analysis for the Purposes of Drug Testing and Release of Information" form. This form outlined the agreement to collect and analyze urine samples, authorized the release of test results to employer representatives, and stated the potential consequences of refusal, including disciplinary action.

25.     The form indicated testing would involve either a 5-panel or 10-panel drug screen. The 5-panel screen tested for amphetamines, cocaine, marijuana (THC), phencyclidine (PCP), and opiates, while the 10-panel screen added barbiturates, benzodiazepines, methamphetamine, methadone, and oxycodone.

26.     Under the threat of disciplinary action, including termination, each of the employees present underwent both a breathalyzer and a urine test in the van. They were instructed that no one could leave until all tests were completed.

27.     During the breathalyzer test, employees were instructed to blow into a disposable mouthpiece connected to the device, observed by the RPT representative. For the urine test, the representative positioned himself directly behind each individual while they provided their sample in a specimen cup. The van door remained open, making it possible for the employees to be seen urinating. Additionally, the same gloves were used by the RPT representative for handling multiple tasks, including IDs, paperwork, urine samples, and breathalyzer equipment, without being changed between individuals.

28.     All employees tested negative for drugs and alcohol, confirming the absence of any substance abuse among the group.

29.     Regardless, the drug and alcohol testing experience was deeply humiliating for the employees, as they were subjected to invasive procedures under constant observation, treated as suspects without cause, and forced to surrender their dignity in a public and demeaning setting.

30.     As the testing was taking place, Thomas G. Mari, President/Principal Officer of Local 25, notified Mayor Lungo-Koehn in writing that the drug testing violated the collective bargaining agreement (CBA), which does not allow blanket drug testing based on probable suspicion. Additionally, he asserted that the testing violated Department of Transportation (DOT) regulations, which only permit drug testing on an individual basis when there is probable suspicion and require such testing to be conducted by two supervisors who are properly trained to observe signs of drug use. Mari demanded that the testing be stopped immediately and insisted that the City comply with the terms of the CBA and applicable laws and regulations moving forward.

31.     Despite receiving Mari's notice, which explicitly outlined the illegality of the drug testing, Mayor Lungo-Koehn allowed the testing to proceed unabated.

32.     Under the City of Medford's drug testing policy, "reasonable suspicion" drug testing is allowed in the case of "safety-sensitive" employees, such as DPW employees who hold CDL or hoisting licenses permitting them to operate large trucks or heavy machines, only when a trained supervisor observes specific, contemporaneous, and articulable signs that indicate an employee may be under the influence of alcohol or controlled substances. These observations must relate to the employee's appearance, behavior, speech, or body odor and occur immediately before, during, or just after the employee performs safety-sensitive functions. The policy explicitly states that the mere possession of alcohol or controlled substances does not justify testing, and a written record of the observations must be prepared and signed by the supervisor or management employee. Moreover, the policy requires testing to comply with strict timing and procedural standards, ensuring the integrity of the process and protecting employees' rights.

33.     Likewise, under DOT Regulations, which apply to DPW employees holding CDL licenses, reasonable suspicion testing is allowed only when a supervisor observes specific, contemporaneous, and articulable signs of alcohol or drug use, such as changes in appearance, behavior, speech, or body odor. These observations must be made during, just before, or just after the employee performs a safety-sensitive function, and the supervisor making the determination must be trained to identify the signs of substance abuse. Testing requires proper documentation, including a written record of the observations, signed by the observing supervisor, and it must comply with strict timing and procedural standards outlined in the regulations. 49 C.F.R. § 382.307.

34.     Medford's drug testing policy and the DOT Regulations were drafted to provide a threshold for factors necessary to justify a search under the Fourth Amendment of the United States Constitution. Under the Fourth Amendment, it is well established that public employees retain their constitutional right to be free from unreasonable searches and seizures, even in the

workplace. Only a compelling interest can force public employees to surrender this basic human right. Accordingly, in the context of public employment, it is well-established under precedents of the United States Supreme Court, that for employees with CDL licenses like the DPW employee here, a search—such as a drug or alcohol test—is deemed reasonable only if it is supported by specific, contemporaneous, and articulable observations of impairment, as required under DOT regulations. These standards ensure that employees are not subjected to intrusive searches based on arbitrary or generalized suspicion, maintaining the balance between governmental interests and individual constitutional rights.

35. Notably, as Plaintiffs' employer, Medford is not permitted to subject its employees, even those holding CDL licenses, to random drug testing at its sole discretion. Under the Department of Transportation regulations governing CDL holders, random drug testing must adhere to specific conditions. The testing process must be managed through an independent consortium or third-party administrator (C/TPA) or another external agency to ensure impartiality and compliance. The selection of employees for testing must be conducted using a scientifically valid method, such as a random number generator or similar impartial mechanism, ensuring that all eligible employees have an equal chance of selection at every testing instance. Additionally, the testing program must apply only to employees performing safety-sensitive functions at the time of selection, and the tests must be unannounced and distributed reasonably throughout the calendar year. 49 C.F.R. § 382.305.

36. The drug testing of the DPW employees on December 9, 2024, violated the standards required under Medford's drug testing policy, the DOT regulations, and the Fourth Amendment. The discovery of a single unused syringe in a DPW trash can, unconnected to any specific employee or observable behavior, fails to satisfy the criteria for reasonable suspicion testing under all applicable frameworks.

37.    Medford's policy explicitly states that reasonable suspicion testing is only permissible when a trained supervisor observes specific, contemporaneous, and articulable signs of impairment, such as an employee's appearance, behavior, speech, or body odor. Here, no such observations were made. Instead, the decision to test the employees was predicated solely on the discovery of the unused syringe, an item found in a shared and public space with no direct link to any individual employee. The policy further clarifies that the mere possession of alcohol or controlled substances does not justify testing. An unused syringe in a communal trash can falls far short of providing the individualized suspicion required under Medford's policy.

38.    The DOT regulations mirror these requirements, mandating that reasonable suspicion testing must be based on observable behaviors or characteristics suggesting substance use. The regulations require trained supervisors to document their observations in writing, explicitly tying them to specific employees performing safety-sensitive functions. Here, there is no evidence that any DPW employee exhibited signs of impairment or that any such observations were documented. The testing decision lacked the individual-specific indicators of impairment that the DOT regulations demand, rendering the tests noncompliant.

39.    Under the Fourth Amendment, public employees are protected from unreasonable searches, even in the workplace. A workplace drug test constitutes a search and must therefore meet the standard of reasonableness. Courts have consistently held that searches must be justified at their inception and narrowly tailored to their objectives. The discovery of a single unused syringe in a trash can—an item that could have been placed there by any number of individuals, including members of the public—does not provide a constitutionally sufficient basis for subjecting employees to invasive drug testing. Without specific and individualized suspicion, the testing became a broad and arbitrary intrusion, violating the employees' constitutional rights.

40.    Upon information and belief, Mayor Lungo-Koehn and Director Crowley, both Massachusetts-licensed attorneys, were aware—even before receiving Mari's notice—that the drug test they ordered violated Medford's own policy, DOT regulations, and fundamental constitutional protections.

41.    Nevertheless, motivated by their animus toward Local 25 and Plaintiffs for opposing Medford's unlawful employment practices and exercising protected rights, and notably in direct response to the belief that the Mayor's favoritism toward the politically connected Doe had been raised at the meeting, they ordered the testing as an act of retaliation. Their intent was unmistakable: to punish Plaintiffs for their protected activity and to exploit the situation as an opportunity to discipline any employee who might refuse the test or produce a positive result.

42.    The retaliatory motivation of Mayor Lungo-Koehn and Director Crowley is starkly evident in their selective enforcement of drug testing policies. Upon information and belief, in contrast to a politically connected employee, Plaintiffs were ordered to undergo invasive and humiliating drug tests based solely on the discovery of an unused syringe in a communal trash can.

43.    By targeting employees without any articulable suspicion, the Mayor and Director Crowley demonstrated a gross abuse of power, using the City's policies as a weapon against their critics while prioritizing personal and political gain over workplace safety and fairness. This selective and retaliatory application of the rules underscores the illegitimacy of their actions, and the harm inflicted on employees acting in good faith.

44.    Upon information and belief, with the failure of the drug test scheme and upon reflection of how blatantly they had violated Plaintiffs' constitutional rights, Mayor Lungo-Koehn and Director Crowley decided to contrive a justification for the tests.

45.    To that end, on the day after the test, December 10, 2024, at 12:42 p.m., Director Crowley sent an email to Hatch and Campbell of Teamsters Local 25. In this email, Crowley falsely claimed that the drug testing was prompted by statements made by Hatch during the grievance meeting, specifically attributing to him comments that the DPW was "a mess" with "needles everywhere."

46.    Director Crowley's misrepresentation of Hatch's statements reveals her dishonest and retaliatory motives, highlighting the pretextual nature of her email. Underscoring this pretext, Crowley showed no concern during the meeting about "the needle," which she admitted she had been informed of earlier. Nor did she take immediate steps to order drug testing when Assistant Superintendent Birch notified her about it that morning—a step she would have taken if she truly believed the unused syringe posed a public safety risk.

47.    Moreover, the timing of her email—sent over 24 hours after the grievance meeting and nearly a day after the testing was ordered—further underscores a bad-faith attempt to justify their actions after the fact. These facts make clear that the testing was retaliation, not a legitimate response to workplace concerns.

### COUNT I
### Claim for Violation of Fourth Amendment Rights Under § 1983
### Illegal Search and Violation of Privacy Safeguards
### *Plaintiffs v. Defendants Lungo-Koehn and Crowley in Their Individual Capacities*

48.    Plaintiffs incorporate by reference all prior paragraphs as if fully set forth herein.

49.    Under 42 U.S.C. § 1983, it is unlawful for any person, under the color of law, to deprive any other person of any rights, privileges, or immunities secured by the Constitution or laws of the United States.

50.     The Fourth Amendment guarantees individuals the right to be free from unreasonable searches and seizures. This protection applies to public employees, including workplace searches such as drug and alcohol testing conducted by government employers.

51.     Drug and alcohol testing constitutes a search under the Fourth Amendment because it involves physical intrusion into bodily integrity and the collection of sensitive personal information. *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 617 (1989).

52.     Plaintiffs, as public employees, retain their Fourth Amendment rights, and any search—including drug and alcohol testing—must be reasonable, justified at its inception, and appropriately limited in scope to achieve legitimate government objectives.

53.     Defendants Lungo-Koehn and Crowley, acting under color of state law, violated Plaintiffs' Fourth Amendment rights by subjecting them to drug and alcohol testing without reasonable suspicion, individualized justification, or adherence to procedural safeguards.

54.     Medford's written drug testing policy and federal Department of Transportation (DOT) regulations provided procedural safeguards that created a reasonable expectation of privacy for Plaintiffs. These safeguards required:

55. Observations of specific, contemporaneous, and articulable signs of impairment by a trained supervisor;

56. Documentation of such observations in a written record; and

57. Testing conducted in strict compliance with procedural standards.

63.     Defendants violated these safeguards and constitutional standards by:

58. Ordering drug and alcohol testing based solely on the discovery of an unused syringe in a communal trash can, which provided no individualized suspicion of impairment or misconduct;

14

59. Failing to observe or document any specific, articulable signs of impairment for any Plaintiff;

60. Coercing Plaintiffs to submit to invasive testing under threat of disciplinary action, up to and including termination; and

61. Conducting testing in the presence of uniformed police officers, creating a coercive and intimidating environment.

64. The testing procedures themselves were excessively invasive, involving improper safeguards and violations of bodily integrity. Plaintiffs were subjected to testing that included:

62. Observed collection of urine samples without adequate privacy protections;

63. Use of unsanitized and improperly handled equipment; and

64. Invasive monitoring during testing that compounded the intrusion on Plaintiffs' privacy.

65. These actions not only violated the Fourth Amendment's prohibition on unreasonable searches but also undermined Plaintiffs' privacy rights safeguarded by established workplace policies and constitutional standards.

66. Defendants Lungo-Koehn and Crowley acted knowingly and with reckless disregard for Plaintiffs' constitutional rights, as evidenced by their failure to adhere to basic legal and procedural safeguards despite having extensive notice of their obligations. Both individuals were aware of the protections afforded by Medford's drug testing policy and the DOT regulations, which they were obligated to follow as part of their roles. Despite this knowledge, they ignored the absence of specific, contemporaneous, and articulable signs of impairment and instead based the decision to test Plaintiffs on the discovery of an unused syringe in a communal trash can—a justification they knew, or reasonably should have known, was constitutionally insufficient. Their decision to enforce testing procedures in the presence of uniformed police

15

officers further underscores their reckless disregard for Plaintiffs' rights, creating an environment of coercion and fear that amplified the unconstitutional nature of the search.

67.    As a direct and proximate result of these unconstitutional actions, Plaintiffs suffered humiliation, invasion of privacy, emotional distress, and other damages.

## COUNT II
### Claim for Retaliation in Violation of the First Amendment and 42 U.S.C. § 1983
### Retaliation for Petitioning Activity
### *Plaintiffs v. Defendants Lungo-Koehn and Crowley in Their Individual Capacities*

68.    Plaintiffs incorporate by reference all prior paragraphs as if fully set forth herein.

69.    It is a clear, unmistakable, and established principle under the United States Constitution that the First Amendment protects individuals' rights to free speech, to petition the government for redress of grievances, and to access the courts. This protection extends to public employees who assert their legal rights through lawsuits or other legal proceedings.

70.    Plaintiffs engaged in constitutionally protected activity by filing claims against the City of Medford in *Ayala et al. v. City of Medford*, No. 22-10115-MPK (D. Mass. filed January 25, 2022), which included allegations under the Fair Labor Standards Act (FLSA) and the Massachusetts Wage Act.

71.    Defendants Lungo-Koehn and Crowley violated Plaintiffs' First Amendment rights by retaliating against them for engaging in this protected petitioning activity. Specifically, Defendants ordered unwarranted and invasive drug testing as a punitive measure.

72.    Defendants acted knowingly and with reckless disregard for Plaintiffs' First Amendment rights. Aware that Plaintiffs' involvement in the *Ayala* lawsuit was constitutionally protected, they orchestrated and carried out the drug testing to punish Plaintiffs and deter them from pursuing further claims. Their retaliatory intent is evidenced by the lack of reasonable

suspicion, deviation from established policies, and timing of the testing immediately after grievances were raised.

73.    As a direct and proximate result of these retaliatory actions, Plaintiffs suffered emotional distress, humiliation, a chilling effect on their exercise of constitutional rights, and other damages.

## COUNT III
### Claim for Retaliation in Violation of the First Amendment and 42 U.S.C. § 1983
### Retaliation for Exercising Rights of Free Speech
### *Plaintiffs v. Defendants Lungo-Koehn and Crowley in Their Individual Capacities*

74.    Plaintiffs incorporate by reference all prior paragraphs as if fully set forth herein.

75.    The First Amendment protects individuals' rights to free speech, to petition the government for redress of grievances, and to support political candidates of their choice.

76.    Plaintiffs exercised these rights by participating in protests, supporting an electoral opponent of Mayor Breanna Lungo-Koehn, and publicly criticizing her administration.

77.    Defendants knowingly and with reckless disregard violated Plaintiffs' First Amendment rights by ordering invasive and unwarranted drug testing without reasonable suspicion and coercing Plaintiffs under threat of termination. Their intent was retaliatory and designed to suppress Plaintiffs' future protected activity.

78.    As a direct and proximate result of these retaliatory actions, Plaintiffs suffered humiliation, emotional distress, reputational harm, and a chilling effect on their willingness to engage in future protected activities.

**COUNT IV**
**Claim for Municipal Liability Under Monell and 42 U.S.C. § 1983**
**Fourth and First Amendment Violations**
*Plaintiffs v. City of Medford*

79.     Plaintiffs incorporate by reference all prior paragraphs as if fully set forth herein.

80.     Under *Monell v. Department of Social Services*, 436 U.S. 658, 690-91 (1978), a municipality is subject to liability under 42 U.S.C. § 1983 for unconstitutional policies, practices, or customs that it officially sanctions or permits and that result in the deprivation of constitutional rights.

81.     The City of Medford is liable for the unconstitutional actions of Defendants Lungo-Koehn and Crowley, who acted as final policymakers and whose decisions directly reflect the City's official policy and practices.

82.     Medford failed to provide adequate training and oversight to ensure compliance with its own drug testing policies, DOT regulations, and constitutional standards, fostering a culture of disregard for employee rights.

83.     Medford further failed to implement safeguards to prevent retaliation against employees for exercising their rights under the First Amendment, creating a culture in which retaliatory actions were permitted to occur.

84.     These failures, combined with Medford's ratification of Defendants' actions, demonstrate deliberate indifference to the constitutional rights of its employees.

85.     As a direct and proximate result of Medford's unconstitutional policies and deliberate indifference, Plaintiffs suffered humiliation, emotional distress, reputational harm, and the violation of their constitutional rights.

**COUNT V**
**Retaliation in Violation of the Massachusetts Wage Act (M.G.L. c. 149, § 148A)**
*Plaintiffs v. City of Medford and Lungo-Koehn and Crowley in Their Official*
*Capacities*

86.     Plaintiffs incorporate by reference all prior paragraphs as if fully set forth herein.

87.     The Massachusetts Wage Act, M.G.L. c. 149, § 148A, prohibits employers from retaliating against employees who assert their rights under the Act, including claims for unpaid wages or participation in wage-related legal actions.

88.     Plaintiffs have engaged in protected activity under the Wage Act by asserting claims against the City of Medford in *Ayala et al. v. City of Medford*, No. 22-10115-MPK (D. Mass. filed Jan. 25, 2022), including claims that their rights to pursue claims under the Wage Act survived a mediated settlement of their FLSA claims.

89.     Defendants Mayor Breanna Lungo-Koehn and Director Lisa Crowley, acting under color of state law and in their individual and official capacities, retaliated against Plaintiffs for their involvement in the *Ayala* case and for asserting Wage Act claims by subjecting them to unwarranted and humiliating drug testing.

90.     Defendants' actions were motivated by animus toward Plaintiffs for their protected activity, including their role in the *Ayala* case, which sought to hold the City accountable for wage violations.

91.     Defendants' retaliatory actions caused Plaintiffs to suffer humiliation, emotional distress, and a chilling effect on their ability to assert their statutory rights under the Wage Act.

92.     The City of Medford is liable for these retaliatory actions under the doctrine of respondeat superior because Defendants Lungo-Koehn and Crowley, acting as final policymakers, implemented and ratified the unconstitutional and retaliatory testing.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter a judgment:

(a) awarding them damages for emotional distress, compensatory and punitive damages, attorney's fees, treble damages, and liquidated damages as provided by 42 U.S.C. § 1983, and any other applicable law;

(b) issuing a declaratory judgment stating that Defendants' actions violated Plaintiffs' constitutional rights under the Fourth Amendment, as well as applicable federal and state laws and policies;

(c) granting injunctive relief to prevent Defendants from engaging in further unconstitutional searches, including drug and alcohol testing without proper individualized suspicion or adherence to established legal and policy safeguards;

(d) requiring Defendants to implement and enforce policies, training, and oversight measures to ensure compliance with constitutional and statutory rights of employees, particularly in relation to drug and alcohol testing procedures;

(e) granting such other and further relief as this Court deems necessary and proper.

## JURY DEMAND

PLAINTIFFS DEMAND A TRIAL BY JURY.

Respectfully submitted,

PLAINTIFFS ANTONIO ALUIA, NOEL
AYALA, MICHAEL AMOROSO, RONALD
BAKER, MICHAEL CHRISTOPOULOS,
GERARD CONTALDI, ERIC DICESARE,
RINO DISTEFANO, DENNIS DONEHEY,
RICHARD ECKERT, MICHAEL HARVEY,
KYLE HEATH, HEATH JOHNSTON,
NICHOLAS KERGER, PETER KERGER,
MARK LITTLEFIELD, JOSEPH PALLADINO,
JOHN PELLEGRINI, DAVID PELRINE,
LORENZO PUCCIO, EDWARD RILEY,
BRENDAN SELUTA, STEPHEN TENAGLIA,
MARC TODISCO, JAMES WILLIAMS, and
LEROL ZEPHYR

By their Attorney:

s/Daniel W. Rice
Daniel W. Rice, BBO # 559269
HARRINGTON, RICE & MAGLIONE, LLC
738 Main Street
Hingham, Massachusetts 02043
(781) 964-8377
dwr@harringtonrice.com

Dated: December 17, 2024